MICHAEL J. IOANNOU (SBN 95208)
LITA M. VERRIER (SBN 181183)
ROPERS, MAJESKI, KOHN & BENTLEY
80 North First Street
San Jose, CA 95113
Telephone: (408) 287-6262
Facsimile: (408) 918-4501

Attorneys for Defendants
MARTIN MEEKER, AHLGREN VINEYARD,
PELICAN RANCH WINERY, SANTA CRUZ
MOUNTAIN VINEYARD, SAVANNAH-
CHANELLE VINEYARDS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES MEEKER d.b.a THE MEEKER VINEYARD,<br><br>Plaintiff,<br><br>v.<br><br>MARTIN MEEKER, AHLGREN VINEYARD, PELICAN RANCH WINERY, SANTA CRUZ MOUNTAIN VINEYARD, SAVANNAH-CHANELLE VINEYARDS, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. C-02-00741 JSW<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE**<br><br>Date: April 2, 2004<br>Time: 9:00 a.m.<br>Courtroom 2<br>The Honorable Jeffrey S. White<br><br>**Complaint filed: February 12, 2002** |

## I. INTRODUCTION

Defendants Martin Meeker ("Meeker"), Ahlgren Vineyard ("Ahlgren"), Pelican Ranch Winery ("Pelican"), Santa Cruz Mountain Vineyard ("Santa Cruz"), and Savannah-Chanelle Vineyards ("Savannah") (collectively "Defendants"), submit this Opposition to Plaintiff's Motion to Strike Defendants' Expert Secondary Meaning Survey ("Expert Survey"). As detailed below, the Expert Survey submitted by Defendants is not properly stricken, as it is a survey conducted by a well-known research firm, Dr. Deborah Jay is more than qualified to conduct said surveys, Dr. Jay has had her surveys relied on by courts in the past, and the survey contains irrefutable evidence of lack of secondary meaning of Plaintiff's mark, thereby entitling Defendants to

summary judgment on all causes of action in the Complaint.

## II. MEMORANDUM OF POINTS AND AUTHORITIES

**A.   SURVEY TIMELY SUBMITTED WITH REQUIRED INFORMATION**

As set forth in Defendants' Opposition to Plaintiff's Ex Parte Application, the Expert Survey was conducted as soon as Defendants obtained evidence from Plaintiff that would guaranty a trustworthy and reliable survey. Exact "median prices" of wine, exact distribution of wine in each state in each year, varietals of wine sold to each state are some of the many areas of discovery that were not responded to by Plaintiff. As such, the survey was skewed to favor Plaintiff based on the information available. (See Declaration of Lita M. Verrier in Opposition to Plaintiff's Ex Parte Application.) The documents submitted in support of the Motion to Strike filed by Plaintiff were, in fact, received by Defendants, but the information is seriously incomplete and only provides piecemeal information. Regardless, since the Court continued the hearing on both parties' Motions for Summary Judgment, Plaintiff's argument of untimely filing of the Expert Survey is moot. Despite the additional time, Plaintiff has not sought to depose Dr. Jay to inquire or cross-examine as to the methods employed, information used to prepare the survey questions, or other relevant information. (Declaration of Lita M. Verrier in Opposition to Motion to Strike (¶ 5,"L. Verrier Decl., in Opp. To Motion to Strike").

As set forth in Federal Rules of Civil Procedure, rule 26(a)(2)(C), expert disclosures and reports shall be made when the court directs. Absent a court order or stipulation of the parties, such disclosures are due 90 days before trial. (Fed. Rules Civ.Proc., rule 26(a)(2)(C)). In this case, expert reports are not due to be disclosed until March 29, 2004. (Case Management Order, Exh. "A" to Defendants' Request for Judicial Notice filed contemporaneously herewith.)" As such, the Expert Survey is not untimely.

The requirements that an expert must comply with are broad and detailed, thus assuring that the expert opinion may be meaningfully reviewed by the Court to determine its admissibility and weight to be given. Unless otherwise provided by court order or stipulation, each party must disclose:

(1) the identity of expert witnesses who it expects to use at trial to present evidence under Federal Rules of Evidence, rules 702, 703 or 705;

(2) as to certain of these experts, a written report, prepared and signed by the expert containing a complete statement of all opinions to be expressed and the basis and reasons, and certain other information. (Fed. Rules Civ.Proc., rules 26(a)(2)(B) and (b)(4)(B));

(3) The report must be prepared by the expert in writing and signed by the expert. (Fed. Rules Civ.Proc., rule 26(a)(2)(B);

(4) Each report must contain a "complete statement" of the opinions to be expressed, the bases for the opinions, and the data considered in forming the opinion; the qualifications of the witness; all publications authored by the expert within the preceding 10 years; the compensation to be paid to the expert; and a listing of other cases in which the witness has testified as an expert (at trial or deposition) in the past four years. (Fed. Rules Civ.Proc., rule 26(a)(2)(B))

In this case, Dr. Deborah Jay of Field Research Corporation has complied with each of the Federal Rule requirements. In addition to a detailed expert consumer survey, Dr. Jay has attached her qualifications as the "President and Chief Executive Officer of Field Research Corporation, a San Francisco-based research firm specializing in marketing and public opinion surveys" with more than 25 years of experience, having written 38 articles in the past 10 years, and having testified in eight federal cases in the past four years, including three in California District Courts. (Expert Survey, Sections III & IV., attached as Exh. "A" to L. Verrier Decl. in Reply to Defendants' Motion for Summary Judgment ("L. Verrier Reply Decl."))

Dr. Jay also listed her compensation, a detailed statement of the opinions expressed and has signed the report under penalty of perjury. (Expert Survey, Sections V, VI, VII & VIII). Lastly, Dr. Jay provided the Appendices showing the exact results of the survey. (Expert Survey, Appendices A-E). As such, the requirements of a proper expert disclosure have been met.

**B.  SURVEY IS ADMISSIBLE**

In the Ninth Circuit and in many other Circuits, surveys have long been used in trademark cases. The Ninth Circuit has stated that "challenges to survey methodology go to the weight given the survey, not its admissibility." (Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997.) "Expert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the

1  affidavit, even though the underlying factual details and reasoning upon which it is based are
2  not." (Bulthuis v. Rexall Corp., 789 F.2d 1315, 1318 (9th Cir. 1985).)

3  Even if the Court assumes that there were methodological flaws, it does not render a
4  survey inadmissible. As the Court in Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134
5  (9th Cir. 1997), specifically stated: "Unlike novel scientific theories, a jury should be able to
6  determine whether asserted technical deficiencies undermine a survey's probative value." (Id. at
7  1143 n.8); *see also* Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 780 F.Supp. 1283,
8  1296 (N.D. Cal. 1991), *aff'd*, 964 964 F.2d 965 (9th Cir. 1992) (holding that alleged under-
9  inclusiveness of survey in copyright infringement action affected "the weight of the survey not its
10 admissibility"), *cert. denied*, 507 U.S. 985 (1993).

11 Particularly in trademark cases, where the issues revolve around potential consumers,
12 surveys are routinely used. "Surveys are admissible, if relevant, either as nonhearsay or through a
13 hearsay exception." (Prudential Ins. Co. v. Gibraltar Fin. Corp., 694 F.2d 1150, 1156 (9th Cir.
14 1982), *citing* Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 682-684.
15 (S.D.N.Y. 1963).) "Surveys conducted according to accepted principles are routinely admitted."
16 (Id.)

17 The claim by Plaintiff that a survey cannot be used to show lack of secondary meaning,
18 but only affirmatively to prove secondary meaning is incorrect. The same survey is used whether
19 attempting to show secondary meaning or lack thereof. Either the result favors Plaintiff because a
20 significant number of potential purchasers associate the name "Meeker" with wine, or they favor
21 Defendant by showing that the relevant consumers do not make such an association. Plaintiff
22 also claims that no court has relied on such a survey to show lack of secondary meaning. (Motion
23 to Strike, p. 10, lines 10-16). To the contrary, in the well-known Ninth Circuit Levi Strauss case
24 the court held: "The district court's finding of *no secondary meaning* in the tab as applied to the
25 shirt market *was based primarily upon careful, expert surveys of purchasers*, including Strauss's
26 own survey. . . . . . The survey which the district court believed supported a finding of no
27 secondary meaning was conducted for Strauss and was probative evidence that a substantial
28 segment of the purchasing public did not associate the tab as used on shirts with a single source,

1  i.e., Strauss. . . . . The district court  . . .. did not err in finding no secondary meaning in the tab as
2  applied to the shirt market." (Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1358 (9th Cir.
3  1985) (emphasis added).)  Where Plaintiff has the burden of proving secondary meaning in a
4  mark, and a Defendant moves for summary judgment pointing to evidence that tends to show the
5  lack of secondary meaning, summary judgment will be granted unless the Plaintiff provides
6  sufficient evidence to show an issue of fact on secondary meaning.  (5 McCarthy § 32:119 at 32-
7  175).

### C. AN EXPERT SURVEY IS WELL-ESTABLISHED AS THE BEST EVIDENCE OF SECONDARY MEANING

It is admitted in this action that the sole manner in which any of Plaintiff's claims may survive is for Plaintiff to prove that the name "The Meeker Vineyard" had acquired "secondary meaning" in the minds of the relevant consumers as of approximately 1990, when Defendant Martin Meeker first began using his surname mark in conjunction with his grape-growing business.[1]  The requirement for Plaintiff to prove secondary meaning prior to being afforded protection as a trademark is due to the fact that "Meeker" is a surname and, therefore, a "weak mark" that will only be afforded protection upon a showing of secondary meaning.

"A plaintiff may establish secondary meaning through direct and circumstantial evidence."  (Continental Lab Prods. v. Medax Intl, 114 F.Supp.2d 992, 999-1000 (S.D. Cal. 2000) citations omitted).)  "Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning."  (Id., citing Levi Strauss & Co., 778 F.2d at 1358.)  It is well-established that expert market surveys are the best evidence of secondary meaning.  (Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252 (9th Cir. 2001); Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989)).  As such, claims of "irrelevance," "sham," "statistician baloney" "illusion of scientific support" are uncalled for.

In order to defend against Plaintiff's claims for millions of dollars and an injunction, Defendants commissioned such a survey from Dr. Deborah Jay of Field Research Corporation

---

[1] Levi Strauss, supra at 1358.

whose work is well renowned and has been relied on in such cases as the recent <u>Napster</u> case. The methods used and creation of the questionnaire are described in detail and supported by the evidence. Plaintiff asserts several alleged flaws with the survey that are addressed below:

### 1. **The Questions In the Survey In General**

In order to provide a "realm" of potential consumers but also not be "suggestive" as to for what product the survey was being commissioned, Dr. Jay developed a series of questions that both limited the target group to "potential purchasers or consumers" and used "control questions" to ensure that the surveyed persons did not know it was a "wine survey." (Expert Survey, p. 2.) The survey also had to "anticipate" where Plaintiff would sell his wines, and in an abundance of caution, Plaintiff's "backyard" was chosen. Additionally, controls were used – in two different ways – in order to show two things: (1) the amount of "noise" or potential "guessing" and; (2) that another California surname wine had a statistically significant consumer recognition so that a comparison of sorts could be made. (Expert Survey, p. 3).

### 2. **Irrelevant or "Wrong" Questions**

Plaintiff first asserts that the survey is flawed because "the Study fails to identify which of the three criteria served to determine ineligibility in what number of cases." This is incorrect, as the actual results are attached to the survey, and as set forth in the Expert Report, if <u>any</u> of the relevant eligibility criteria were not met, the participant was deemed "ineligible." The result of this was to create a highly sophisticated group of potential consumers who are knowledgeable in use of the Internet, and who drink and buy wines in California. (Expert Survey, pp. 8-9.) The specific percentage responses to each eligibility question are set forth in the footnotes to Table 3 on page 13 of the Expert Report. "To be eligible for the survey, the adult had to be age 21 or older and satisfy the following criteria:

- Have watched the Food Network or other television programs about food and wine in the past three months <u>or</u> have read *Wine Spectator, Gourmet*, or other magazine or newspaper articles about food and wine in the past three months.

- Have used the internet to find out about products or services to buy in the past three months.

- Have bought at a store, at another retail outlet, or over the Internet, standard-size bottles of California wine that cost $8.00 or more in the past three months <u>or</u> think that they will do so in the next three months.

- Not work or live in a household in which someone works for a winery or in the wine industry <u>and</u> not work in marketing research or advertising research."

As opposed to Plaintiff's contention, there was no eligibility criteria requiring participants to watch television programs concerning diet and exercise. (Mtn. To Strike, p. 6:25-28, p.7:1-10.) As set forth in the Expert Survey, the questions about health and fitness were <u>not</u> used as eligibility criteria (see above) but were used as a "control" to curtail the possibility that people would realize the survey was about wine, thereby creating a bias or a higher likelihood of "guessing."

Plaintiff next criticizes the "internet question" by claiming that Plaintiff "has never used his website to market his wines." This is problematic for two reasons. Preliminarily, the Internet question does not require consumers to <u>purchase wine</u> on the Internet. It simply asks if the consumer <u>uses</u> the Internet to obtain information about products and services. As Plaintiff has had a Web site for approximately one year, and in his instances of "actual confusion" cites to Internet "confusion," the question is relevant. Plaintiff's Web site actually advises potential purchasers or interested parties to "Look out in the next week or two for a MEEKER SPRING TOUR 2004 SCHEDULE . . . We will be working hard to sell Meeker wine in states near you." (Exhibit "A" to L. Verrier Decl., in Opp. To Motion to Srike). Secondly, the claim that Plaintiff has not used the Internet in the past to market his wines contradicts his Cross-Motion for Summary Judgment. In his Points and Authorities, Plaintiff states that: "Plaintiff's wines have also been available online at <u>www.virtualvineyards.com</u> and <u>www.wine.com</u>." (Plaintiff's Cross-Motion, 6:18-21). Plaintiff goes on to explain that part of his "extensive advertising" of his wines occurs "on internet sites like <u>www.thewinesnob.com</u>; www.winespectator.com, and <u>www.eRobertParker.com</u>." (Plaintiff's Cross-Motion, 17:15-17). Therefore, consumers who use the Internet, along with the other criteria in the Expert Survey, are <u>more likely</u> to have heard of Plaintiff's wine than other potential consumers.

The next objection is that as to the criteria that participants have purchase or will purchase

1  California wine at a price point of $8.00 per bottle or more. Dr. Jay chose a price point of $8.00
2  <u>or greater</u> based on the information supplied by Plaintiff. Plaintiff's Web site for example, has
3  wine that ranges from $9.00 to $65.00 per bottle. (Exh. "A" to L. Verrier Decl.) The Wine
4  Spectator Web site shows Plaintiff's "famous" Zinfandel wine at $10.00. (Exh. "B" to L. Verrier
5  Decl.) Other documents provided by Plaintiff that are erroneously marked "Attorneys' Eyes
6  Only" but are primarily magazine articles showing that Plaintiff's wine prices as approximately
7  $8.00 through $15.00 per bottle, with specifics such as: $5.00 (1992 Grenache), $7.00 (1984
8  Zinfandel); $8.00 (1985 Zinfandel); $15.00 (1990 Zinfandel); $15.00 (1991 Zinfandel); $9.00
9  (1992 Cabernet Sauvignon); $6.50 (1993 Chardonnay); $16.00 (1995 Zinfandel); $9.00 (2001
10 Pink Elephant Rose); $14.00 (1999 Zinfandel); $11.00 (1984 Chardonnay); $6.50 (1989
11 Zinfandel Rose); $10.00 (1988 Zinfandel;). The list goes on and on. (Exh. "C" to L. Verrier
12 Decl.) As such, the price point correctly identifies <u>potential</u> consumers of wine in the price range
13 of $8.00 and above.[2]

### D.  QUESTION ASKING ABOUT "MEEKER" RATHER THAN "THE MEEKER VINEYARD"

The question asking about "Meeker" rather than "The Meeker Vineyard" is proper with regard to a secondary meaning survey. If one is asked "What is The Meeker Vineyard" or what is "Beringer wine," it is imagined that only a few select people would not answer "wine" (if any). Vincent N. Palladino, a well-known authority on trademark surveys states that: "A survey designed to test for secondary meaning should measure the level of association between a claimed trademark or trade dress and plaintiff's product. This requires, first, a technique to isolate the mark or dress at issue and, second, an appropriate question or series of questions . . . .Because the issue is whether or not a claimed trademark or trade dress is associated with plaintiff's product, a survey should focus respondents' attention on the mark or dress. This may be a simple matter of using the claimed trademark in a question"  (Vincent N. Palladino, 73 TMR 391, 395.)

"Obviously, a survey also may be conducted by a declaratory judgment defendant, an

---

[2] As stated previously, any discrepancy in a true "median" with regard to wine is a direct result of the inadequacy of the discovery responses or complete refusal to provide documents and responses.

alleged infringer who believes that a survey will show plaintiff's mark lacks secondary meaning, either party in a contested Patent and Trademark Office proceeding, or an applicant for a United States trademark registration. . . . . In order to track the accepted definition of secondary meaning, including the anonymous source rule, a proper question should seek to determine whether or not a claimed trademark or trade dress is associated with plaintiff's product without asking respondents to give plaintiff's name. Without necessarily endorsing any specific language, it is suggested that the question ought to be: 1. Do you associate [claimed trademark] with [product identification] of one, or more than one, company? If a sufficient number of respondents answer "the [product identification] of one company," plaintiff prevails on the secondary meaning issue; the opposite outcome demonstrates a lack of distinctiveness." (Id. at 379, citing  at 379, *citing* Anheuser-Busch Inc. v. Bavarian Brewing Co., 264 F.2d 88, 91, 120 (CA 1959); In re Jockey International, Inc., 192 U.S.P.Q. 579, 581 (TTAB 1976); Federal Glass Co. v. Corning Glass Works, 162 U.S.P.Q. 279, 286-87 (TTAB 1969). "Thus, if respondents are asked whether they associate a claimed trademark or trade dress with the product of one or more than one company as in Question Number 1, over half of those who can give an answer, one way or another, should respond "the product of one company" before secondary meaning will be inferred." (Id.)

E.   **CONTROL GROUP**

Whether or not "Beringer" is found to be a valid statistical and appropriate "control," it in no way diminishes the validity of the "Meeker" portion of the Expert Survey. The "Beringer" control was a "bonus" to essentially forestall the argument that no surname wine in the approximate price range would have significant recognition among potential consumers. The fact that 88% of the eligible participants recognize Beringer as a wine can even be deemed a "pushing off" point from which to measure the consumer response to the "Meeker" name. As the Expert Survey evidences, only 2% of the group associated the name "Meeker" with wine, the same result as the control "Cogan" which was used for "noise" or "guessing." Even assuming that Beringer would be more likely than Meeker to elicit recognition, secondary meaning cannot be shown by having 2% of the relevant group identify Meeker.

"In determining the viewpoint of the prospective purchasers in trademark and unfair competition cases, substantial weight may be accorded the result of a properly conducted survey." (Anheuser-Busch, Inc. v. Stroh Brewery Co., 750 F.2d 631, 639 (8th Cir. 1984)) *citing* Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980); Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803, 817 (8th Cir.), *cert. denied* 395 U.S. 905, 23 (1969); Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976); James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 278 (7th Cir. 1976). "The minor technical or methodological deficiencies of the survey go solely to its weight." (E. & J. Gallo Winery v. Gallo Cattle Co., 1989 U.S. Dist. LEXIS 7950 (U.S. Dist. , 1989), *citing* Prudential Ins. Co. of America v. Gibraltar Financial Corp., 694 F.2d 1150, 1156 (9th Cir. 1982), *cert. denied*, 463 U.S. 1208 (1983). "In assigning weight to the Field survey, account is taken of the fact that defendants' failed to produce survey data of their own." (Id.)

### F.   DR. DEBORAH JAY HAS THE FOUNDATION AND QUALIFICATIONS FOR AN ADMISSIBLE SURVEY

In assessing whether an expert has the appropriate qualifications, the court considers whether the expert offers some special knowledge, skill, experience, training, or education on the subject matter. (Fed. Rules Evid., rule 702; United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000). Thus, admissibility of expert opinion testimony generally turns on the following preliminary question of law determinations by the trial judge under Federal Rules of Evidence, rule 104(a). The relevant questions are: (1) Whether the opinion is based on scientific, technical, or other specialized knowledge; (2) Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue; (3) Whether the expert has appropriate qualifications - i.e., some special knowledge, skill, experience, training or education on that subject matter. (Fed. Rules Evid., rule 702; Jones v. Lincoln Elec. Co., 188 F.3d 709, 1999 WL 551879 (7th Cir. 1999.) The Court also analyzes whether the methodology or technique the expert uses "fits" the conclusions and whether its probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time. (Fed. Rules Evid., rule 403; United States v. Chischilly, 30 F.3d 1144, 1156 (9th Cir. 1994).

1  Dr. Deborah Jay's qualifications cannot be disputed. Additionally, a foundation has been set forth justifying her conclusions, complete with charts and exhibits. As set forth in McCarthy on Trademarks, "the testimony of a survey director alone can establish the foundation for the admission of survey results." (Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 931 (7th Cir. 1984), *quoting* 2 McCarthy § 32:53.

Additionally, a survey is an exception to the hearsay rule under Federal Rules of Evidence, rule 803(24); (Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988). Even if the universe is too narrow, the survey is admitted. (Id.; *see also* 2 McCarthy 32:53. Baumholser v. Amax Coal Co., 630 F.2d 550, 553 (7th Cir. 1980) (witness testified "as an expert and as such was entitled to rely on hearsay evidence to support his opinion, so long as that evidence was of a type reasonably relied upon by other experts in the field. The evidence need not be independently admissible.").

### III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion to Strike in its entirety and afford the Expert Survey the weight it deserves in assessing both parties' Motions for Summary Judgment.

Dated: March 22, 2004                    ROPERS, MAJESKI, KOHN & BENTLEY

By: /s/
　　MICHAEL J. IOANNOU
　　Attorneys for Defendants
　　MARTIN MEEKER, AHLGREN
　　VINEYARD, PELICAN RANCH
　　WINERY, SANTA CRUZ MOUNTAIN
　　VINEYARD, SAVANNAH-CHANELLE
　　VINEYARDS

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II. MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

    A. SURVEY TIMELY SUBMITTED WITH REQUIRED INFORMATION ........... 2

        (1) the identity of expert witnesses who it expects to use at trial to present evidence under Federal Rules of Evidence, rules 702, 703 or 705………..3

        (2) as to certain of these experts, a written report, prepared and signed by the expert containing a complete statement of all opinions to be expressed and the basis and reasons, and certain other information. (Fed. Rules Civ.Proc., rules 26(a)(2)(B) and (b)(4)(B))……………………………….3

        (3) The report must be prepared by the expert in writing and signed by the expert. (Fed. Rules Civ.Proc., rule 26(a)(2)(B)……………………………...3

        (4) Each report must contain a "complete statement" of the opinions to be expressed, the bases for the opinions, and the data considered in forming the opinion; the qualifications of the witness; all publications authored by the expert within the preceding 10 years; the compensation to be paid to the expert; and a listing of other cases in which the witness has testified as an expert (at trial or deposition) in the past four years. (Fed. Rules Civ.Proc., rule 26(a)(2)(B))…………………………………………….3

    B. SURVEY IS ADMISSIBLE ...................................................................................... 3

    C. AN EXPERT SURVEY IS WELL-ESTABLISHED AS THE BEST EVIDENCE OF SECONDARY MEANING ........................................................ 5

        1. The Questions In the Survey In General ........................................................ 6

        2. Irrelevant or "Wrong" Questions .................................................................... 6

    D. QUESTION ASKING ABOUT "MEEKER" RATHER THAN "THE MEEKER VINEYARD" ............................................................................................ 8

    E. CONTROL GROUP ................................................................................................... 9

    F. DR. DEBORAH JAY HAS THE FOUNDATION AND QUALIFICATIONS FOR AN ADMISSIBLE SURVEY ................................. 10

III. CONCLUSION ................................................................................................................ 11

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anheuser-Busch Inc. v. Bavarian Brewing Co., 264 F.2d 88 ........................................................ 9

Anheuser-Busch, Inc. v. Stroh Brewery Co., 750 F.2d 631 ........................................................ 10

Baumholser v. Amax Coal Co., 630 F.2d 550 ............................................................................. 11

Bulthuis v. Rexall Corp., 789 F.2d 1315 ........................................................................................ 4

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Jose*

| | |
|---|---|
| Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252 | 5 |
| Continental Lab Prods. v. Medax Intl, 114 F.Supp.2d 992 | 5 |
| E. & J. Gallo Winery v. Gallo Cattle Co., 1989 U.S.Dist. LEXIS 7950 | 10 |
| Federal Glass Co. v. Corning Glass Works, 162 U.S.P.Q. 279 | 9 |
| Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803 *cert. denied* 395 U.S. 905, 23 | 10 |
| James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266 | 10 |
| In re Jockey International, Inc., 192 U.S.P.Q. 579 | 9 |
| Jones v. Lincoln Elec. Co., 188 F.3d 709, 1999 WL 551879 | 10 |
| Keith v. Volpe, 858 F.2d 467 | 11 |
| Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352 | 5 |
| Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 780 F.Supp. 1283 *aff'd*, 964 964 F.2d 965 | 4 |
| Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925 | 11 |
| Prudential Ins. Co. v. Gibraltar Fin. Corp., 694 F.2d 1150 *citing* Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. 670 | 4 |
| Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134 | 4 |
| Squirtco v. Seven-Up Co., 628 F.2d 1086 | 10 |
| Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 *cert. denied*, 429 U.S. 830 | 10 |
| United States v. Chischilly, 30 F.3d 1144 | 10 |
| United States v. Hankey, 203 F.3d 1160 | 10 |
| Vision Sports, Inc. v. Melville Corp., 888 F.2d 609 | 5 |
| Wendt v. Host Int'l, Inc., 125 F.3d 806 | 3 |
| Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. 670 | 4 |

**FEDERAL STATUTES**

| | |
|---|---|
| Fed. Rules Civ.Proc., rule 26(a)(2) | 1, 2, 3 |
| Federal Rules of Evidence, rule 104 | 1, 10 |
| Fed. Rules Evid., rule 403 | 10 |
| Fed. Rules Evid., rule 702 | 10 |

1    Federal Rules of Evidence, rule 803……………………………………………………………..11

**MISCELLANEOUS**

5 McCarthy § 32:119 at 32-175 ................................................................................................... 5

*Ropers Majeski Kohn & Bentley*
*A Professional Corporation*
*San Jose*